Good morning, Your Honors. Maura Grinnells on behalf of Amelin Pharmaceuticals, Inc. for Amelin. Your Honors, this appeal arises from the District Court's clear error in reversing... Do you want to reserve any time for rebuttal? Oh, yes. I'd like to reserve five minutes for rebuttal, please. Okay. I'll try to notify you when that's the case. Thank you. This appeal arises from the District Court's clear error in reversing its prior order granting a TRO and holding in denying a preliminary injunction that Amelin will not suffer irreparable harm despite a record where such harm abounds. Amelin established by clear and convincing evidence that it will suffer irreparable harm from Lilly's implementation of its new strategic alliance with Boehringer Ingelheim in which Lilly has redeployed the established diabetes sales force that for years has been trained to sell Amelin's diabetes drug and is steeped in Amelin's confidential information to now sell Boehringer's, or B.I.'s, directly competing oral treatment in a priority position using Amelin's confidential information and pursuant to a market allocation scheme that artificially confines Amelin's diabetes treatment to a narrow part of what's called the diabetes continuum of care. In effect, to only a subset of its FDA-indicated uses after exhaustion of oral treatments such as, and in particular, B.I.'s oral treatment, Tragenta, which Lilly is seeking to provide an advantage to by virtue of this new selling model. The need for an injunction, Your Honors, to prevent this irreparable harm Well, first off, you're pushing a little bit of a hard rock uphill in that it's abusive discretion is what you're talking about, right? Yes, Your Honor. All right. And many of the cases that you cite support your argument that the use of confidential information by a competitor constitutes irreparable harm involve non-compete clauses when an employee leaves one company and goes to work for another competitor. But this case is really different. Here Lilly continues to market Bietta and continues to have the same financial incentive to do so. So why do these cases apply here? First of all, Your Honor, actually I think that that makes this case all the more worse. And it's because of the continuing and ongoing nature of the disclosure of the confidential information to a sales force that is conflicted. Conflicted in a way that makes it its new priority is to sell the directly competing drug. So, actually, this is a much worse case than the Nike case and the other cases in which this Court and other circuit courts have enforced restrictive covenants to prevent a former employee with stale information from disclosing that or using it, as was the case in Nike, to cause irreparable harm to the former employer. In our case, on an ongoing basis, each and every day, these same salespeople who we train to market our drug and capture market share from orals who are being given highly confidential and competitive market share. But you've already authorized them to, when the doctors ask questions and you want them to use their drugs, they have to be prepared to answer those questions. And so some of this information that you're talking about ceases to be confidential because you've got to persuade them to use your drug. That's true. There certainly is non-confidential information at issue here, and Amlin is not seeking to protect it nor to enjoin Lilly's use of it. What is at issue here is the information that is defined as confidential under the agreements, and it was identified with specificity by the district court in its TRO order. The district court enumerates in its TRO the specific types of confidential information at issue here. It acknowledged that, in fact, that confidential information was created with a specific purpose of capturing market share from orals. Look, we all know that TROs are issued by district courts a lot quicker on the draw than the final preliminary injunction. So what a district court's little bit disingenuous thing, oh, well, the district court said this to the TRO, and therefore it's bound forever to consider it the same way, which seems to be a lot of the burden of your argument to us. That's a little bit off in terms of how the process works, isn't it? Your Honor, to be sure, the district court did admit additional evidence after the fact, but there was no evidence admitted and certainly no finding made. I'm talking about evidence and thought. Also, if I recall correctly, TROs go down fairly quickly compared to preliminary injunctions. So people can give somewhat more mature thought by the time they get to the preliminary injunction. At least that used to be true among district judges. Maybe it's not true anymore. I am sure that more thought was devoted to this. There was probably about the same amount of time in entering the TRO on the papers as there was between. I mean, he's questioning that argument. I find that argument, I guess, ridiculous because that's why there's a TRO and then you set it over and you have a more lengthy hearing. And so when you argue back that you try to hold the district court to that, that argument just doesn't hold any water to me. But the district court never revisited nor altered its findings. It revisited it by finding something else. No, in fact, Your Honor, respectfully, what the district court did was it never revisited the kinds of confidential information it issued, the copious amounts of confidential information, the nature of that information. That was never contested. What it did do was it found that Lilly had argued that it couldn't be used because of FDA regulations, and that was a non sequitur. The existence of FDA regulations prohibiting certain types of comparative statements had no bearing on the use and, in our case, the misuse of confidential information. The confidential information at issue here included things like messaging strategies. It actually included the strategy to compete with Trojanta, the types of subtle messaging and use of patient preferences and physician preferences and patient profiling that is permitted, that doesn't deal with FDA regulations, and it's highly sensitive. The alliance spent millions of dollars in creating this marketing and promotional information. Okay. Let's dial it back for a second and say, what evidence is in the record that demonstrates that it is likely, not just possible, that Lilly will misuse Amelin's confidential information against Amelin? Exactly how will Lilly misuse the information, and how exactly will the resulting harm be irreparable? Give me exact evidence. Certainly, Your Honor. First of all, these representatives continue to receive this confidential information on a regular basis. That's undisputed. In other words, they're getting it on an ongoing basis. As quickly as Amelin created it. That's not answering the question. Let's go on to answer the question. What I would look at are the identical factors that the Court looked at in Medtronic in finding that it wasn't simply an inference that the former employee would use the confidential information from the former employer. It was based on evidence. And what the Court looked at was the employee's access to information, its marketing in the same sales territory with the same customers. That is exactly what we are dealing with here. We are dealing with sales representatives who get the competitor's information, who are going to the same positions in the same sales territory, who are targeting the same exact ultimate patients, the American Association of Clinical Endocrinologists makes clear these are directly competing drugs, and, in fact, it recommends Amelin's Exenatide over the other. When you say they're directly competing, the oral and injectable are, I don't think people inject just because, you know, there's sort of a logic to, you know, there's a progression in terms of diabetes. And so oral and injectable, how are they directly competing? They are, in fact, the focus is on who is a target population and for whom it is prescribed. The FDA has approved Exenatide across the continuum of care from a monotherapy all the way through orals up to insulin. That means that it is FDA-indicated for the exact same patient population. And, in fact, Lilly admits that it has worked with Amelin over the years to help target patients across the continuum of care. And if I could direct, Your Honors, to the sealed exhibits, exhibit number three, which has been served up to the court because these are sealed. You'll see there's a pullout, and it shows that Amelin has been targeting the entire continuum of care. And to be sure, Your Honor, there is a natural aversion to taking an injection, and it is for that reason that the Alliance has spent millions, hundreds of millions of dollars in trying to break it down, both with promotional strategies and these confidential marketing materials and by investing in Bidurian. And Bidurian is really the elephant in the room here, Your Honor. The district court's order and certainly the expert opinion that she conclusively adopted doesn't address the irreparable harm to Bidurian. Bidurian depends on the platform of today, and the loss of future sales to Bidurian cannot possibly be quantified. That is true by Lilly's own estimation. Can Lilly enter into any of these kinds of agreements like they have with you with others to sell oral? It can, but it has to do so in compliance with two things. One, the contract. Two, the antitrust laws. With respect to the contract, that precludes Lilly from unreasonably preferring any competing drug and requires Lilly to use commercially reasonable efforts to maximize sales of Xenotide. Just by definition, that cannot occur by putting two directly competing drugs into the same bag. Lilly has many sales leads. But what if they're in different bags and different people are ñ different Lilly people are coming to sell the two? Well, yes, Your Honor. That certainly would improve it, and that's what we've argued. I'm not asking whether it would improve it. What I'm asking you is, it sounds to me like your argument would still go that way. Oh, well, it's Lilly, and if you are going to rely upon the cases where somebody leaves a company and takes all the information to another company, here we are, the same company still. So it sounds like what you're really asking for either is an economic matter, which is the way people use injunctions sometimes, we all know. Either it's an economic matter to bludgeon them into a better deal or something else. But it sounds like you're really saying Lilly shouldn't be selling any orals at this point. We don't want them entering in new deals to sell orals because it's the same company. They have our information. Is that right? No, that is not right at all. What are you saying precisely? Lilly cannot use our confidential information by giving it to the same sales force that is selling the directly competing drug, number one. So as long as they have different sales people, it's okay as far as number one is concerned? Well, number two would be it can't market it in a way that now disadvantages us. In other words, it has repudiated the alliance's long-term policy of selling or promoting Exenatide across the continuum of care, and now in order to secure a place for its oral, it's adopted a whole new strategy, and that's shown in the sealed exhibits one and two, which we have submitted to the court, just to market us to a segment of the continuum of care. It seems like you have more people marketing your drug now than you did before. But it's not the quantity. It's the quality. If you have the former Bayeda salesperson going as a priority matter to all the same positions that it historically said, you know, don't think about the ejection. I want to tell you about the benefits of Exenatide because it helps with weight loss and it has better efficacy and the other FDA-indicated benefits. I want to tell you, I've been saying that for years. Now that same person goes to those people who have gotten over the injection barrier, if you will, and says, now I don't, what I want to talk to you about today is our orals. And that will necessarily create a problem in what we've been building up over the years. Well, but you had the same competition when you entered the agreement with Lilly initially. There was another drug that starts with an A. Yes, Actos. Yeah. And then you've also, too, Lilly's loaned you $165 million to develop your new drug, right? That was with interest. So the elephant in the room seems to be that you're trying to use this to sort of take off on where Judge Fernandez was going to exact, to sort of rewrite your contract. Not at all, Your Honor. In fact, Amlin is every, Amlin's only incentive is to promote its Exenatide by its Bayeda and soon to be released by Durian. It is every incentive in maximizing the results of that, which will redound to Lilly's benefit. Lilly's incentives are very different. Lilly has an incentive to recoup its over $400 million investment in Tragenta. It has an incentive in, as it described it, trading up and now getting into the largest revenue generating category of drugs. But doesn't Lilly get the same percentage it got initially when you signed it for selling Bayeda? That hasn't changed, right? That has not changed. But what has changed is now Lilly can do better by leveraging itself across a broader portfolio of drugs and thereby spreading its costs, bringing in new alliance partners, and increasing its profits. For us, we're a $600 million in revenue company. Exenatide, Bayeda, and Bayedrian are everything for us. Lilly is a $24 billion company. Its interest in this particular drug is far less than ours. And Lilly is bound to not unresonate. Has that less been yours when you went, when you signed originally with them? It may have been, but Lilly agreed to maximize commercialization of Exenatide. So what specific evidence do you have that they're not doing that now? Right to this Court, the Exhibits 2 and 3 and the sealed exhibits make very clear that Lilly has adopted a new strategy. It has instructed its sales force that Amelin's Exenatide will not compete at the earliest part of the continuum of care, despite, as I said, the long-term strategy to do just that, to capture market share. That's in black and white. The affidavits of ‑‑ You've got five minutes if you want to reserve. Okay. So in other words, it's very clear that the evidence was that Lilly has adopted a strategy to favor its new partner, and the Court erred in not recognizing the unquantifiability of that harm and the record evidence before it. And I'm going to reserve the rest of my time. Thank you. Thank you. Thank you. Good morning. Good morning. May it please the Court, Robert Long representing Eli Lilly and Company. I think perhaps the place to start is with Lilly's portfolio approach to diabetes medicines. For decades, Lilly has had the approach of presenting a range of diabetes medicines to physicians, and the theory of the portfolio approach is that this will be beneficial to patients and to physicians and to Lilly and its partners by giving the physicians a range of choices. And this was something that Amelin knew about. Indeed, that was featured when Lilly presented to Amelin, and Amelin chose Lilly as its partner that this portfolio approach would be an advantage. And as your honors mentioned, Lilly was already promoting a drug, Actos, another oral diabetes medication. That was well known to Amelin. Lilly still promotes Actos in many countries today. So this has been the philosophy from the beginning. And Trojanta, the new diabetes medicine that's now being offered, is an oral medicine. It's not an injectable. The injection barrier is a marketplace fact. This is not something that Lilly is creating. This is... Well, the appellant's counsel seems to indicate that Lilly has more of an incentive to sell Trojanta rather than Bietta with the new sales force. So is there anything in the record that shows whether they do or they don't? Yes. I mean, the record shows that Lilly has essentially equivalent incentives to promote both drugs. The profits are divided on the same basis for both. And so whether it's an additional prescription for Bietta or an additional prescription for Trojanta, Lilly stands to have essentially the same economic benefit from each. And so it has a strong incentive to promote both, not to promote one and not the other. And indeed, you can see in Lilly's actions that it is following in the course of this economic incentive. By adding Trojanta to the portfolio, there have been significant benefits to amylin. Lilly has been able to expand the size of its diabetes sales force by almost 50 percent, a very large increase. Every single one of those sales representatives is trained in Bietta and can promote Bietta, tell the advantages of Bietta to the physicians that that sales representative... Let's try this, though. It seems to me that what their argument comes down to is something like this. Look, we all know that there's a barrier as to injections and pills. A person would much rather take something orally than be shot up every day or every month or whatever it is. They just would rather do it unless they're... Well, never mind. But anyway, that's what people would rather do, okay? But I understand their argument is, before you took on this new deal, you had a real incentive to fight that barrier and to slug at it and smash at it and say, no, no, no, no, no, being injected is a wonderful thing because of this terrific drug. It's much more fun to be injected than to take a pill. And now your incentive to do that has been somewhat diminished. I think that's what their argument is. How do we answer that? Well, I mean, I think that's a very unrealistic scenario. I mean, first of all, the contract and the record is under seal here. It's a hypo, of course it's under seal. The court has the contracts in front of it. I mean, there are provisions that specifically say that Lilly can promote competing products, and as we have discussed, Lilly had been promoting the Actos oral medication. It also has its own insulins, which are also approved for the FDA, so she could prescribe insulin at the very beginning of the course of diabetes, but it happens less than 1% of the time. And that's also true for Bayetta. I mean, you could say, well, we want you to keep running your head against a brick wall, trying to get people to inject themselves, but in the facts. So Bayetta is twice a day, right, or twice a day? Yes, that's correct. Now, Bidurium is going to be once a week. That's correct. Now, I heard appellant's counsel mention Bidurium. Now, can we consider that, you know, obviously the injection barrier is different on a once a week as opposed to twice a day. So what am I to make of that? They seem to be concerned how that's going to affect Bidurium, and should we even be looking there. Right. Well, I'd make a couple of points about Bidurium. First of all, it has not yet been approved by the FDA, so a preliminary injunction would be to prevent imminent harm, and we're not to that stage yet. The second point I'd make is, I mean, Bidurium is an injectable. It's what's called in the industry a line extension. It's the same molecule, and although it is once a week, and that's an advance, and, you know, Bidurium could be a very successful product, I mean, there are limitations. It's a more complicated process, as you might imagine. If you're going to inject yourself once a week, there are more steps. It's a larger diameter needle. So, you know, the expectations of the parties are that Bidurium will basically replace prescriptions that otherwise would have been written for Bietta or for another injectable that does compete with Bietta called Victoza, another GLP, the same class of drugs. But it's not, by and large, going to take a lot of prescriptions away from oral medications because of this same practical marketplace fact that people would rather take a pill if they can do it. I would mention on one of these sealed exhibits that opposing counsel has handed up, the very first one, which is offered as supposedly as evidence that Lilly has changed its approach. I mean, all it says is that research and experience consistently show that patients will prefer to take a pill if they can take a pill, and physicians will prefer to prescribe a pill if they can prescribe a pill, and that is what research has consistently showed, not just research, but experience all along. So this document does not show a change. This is simply a statement of the facts. Okay, but how do we know, or do we need to know, how do we know that Lilly's sale representatives will not misuse Amelin's confidential information like Amelin says they will? Well, I mean, I would say it's Amelin's burden to show, just as you were saying at the beginning of the oral argument, there's no presumption of irreparable harm. It's not enough to show a possibility of irreparable harm. It would be Amelin's burden to show a likelihood of irreparable harm. Lilly has very strict procedures for maintaining the confidentiality of information. There's really no basis to think that those procedures would not be followed. Lilly doesn't have an incentive to cause harm to Bietta. It shares that burden. Is that just why you're saying that, you know, obviously from the standpoint, there aren't specific instances in the record of misuse, correct? Yes. So what you're saying is that that's their burden, so even though I don't really know that Lilly might not misuse it, I don't have to know that in order to affirm the district court, you're saying, because of the burden? That's absolutely correct. I listened again this morning, and I did not hear the, what you would really expect to hear, that, you know, you've got the, you know, the secret recipe or something. Well, they do seem to be, there is a trade secret component to this that they're arguing, but they're not exactly arguing trade secret. So I guess my question would be, is the information that Amelin's complaining about entitled to the same protection as trade secret? Or what protection is it entitled to? They haven't really argued this in terms of trade secrets, so I don't think it's appropriate for the court to assume it would qualify. I mean, maybe I can say a little bit more. Well, they have, they argue cases, that some of the cases that they're saying support their position are when people leave and they're competing and. Yes. I mean, I do think those cases where it's a non-compete agreement and a high-level executive leaves and goes to a competitor, as Your Honor suggested, I mean, those are quite different situations. I mean, these are sales representatives. There are a lot of sales representatives. There's turnover among sales representatives, as several of the declarations say, because of the nature of the position. These employees are not entrusted with the most sensitive information. Indeed, you know, a great deal of what they have is information to be shared with physicians. That's their job. And with the FDA, that information is not confidential at all. They tell it to physicians. And so. I think they also seem to be arguing, because there's going to be all these new sales people and less experienced people, that they're not going to know how to handle the information as well, so that the likelihood of misuse is higher. Well, Your Honor, I don't think, I don't believe they've made that exact argument. Their argument about the new sales people is they don't think that they're as experienced and that the new sales people will be promoting Bietta as well as Trojanta, and they feel that they ought to be, the more experienced sales people should be focused solely on Bietta. And I'd make a couple of points in response to that. I mean, one is the most experienced sales people are continuing to promote Bietta. I won't mention the exact numbers, but it's hundreds of thousands of times in a year they will promote Bietta in the first or second position. There's a statement in the record, in the briefing by Hamelin, that they'll promote it only in the third position, and that's just false. And you can see that in the Seguino Declaration. You can find that fact. And that, by the way, is well over 40% of the total detailings, it's called, that's required by the contract between Lilly and Hamelin. But beyond that, there are specific provisions in the contracts for what requirements sales representatives must have. And the sales representatives meet all those requirements. They have to have sort of skill that's typical for the industry, and they have to go through special training. They've all gone through that. Beyond those requirements, the party specifically agreed that each, Lilly and Hamelin would each have complete control and complete discretion over their own sales representatives. And so the notion that Lilly could never reassign a sales representative and once one has some responsibility with Bietta, you could never pull them off for any other medication is just, that is not a reasonable reading of the contract, or even close to it. Well, now, I asked counsel for appellant about Actos. Yes. And Hamelin, I think, claims that Bietta was not competing with Actos because Bietta and Actos could be prescribed together. But I'm looking at Hamelin's expert, and Hamelin's expert says that only 4% of the patients start off using TZDs such as Actos, and of that 4%, only 3% claim of them will add a GLP-1. So does that argument say that? It makes sense, Your Honor, because Actos, it can be prescribed along with another drug, but it can also be prescribed on its own. I mean, if you simply go as they do from what would the FDA say is approved, as opposed to what actually happens in the real world, Actos can be prescribed on its own. Insulin, which Lilly has sold from the beginning along with Bietta, can be prescribed right away as a first diabetes medicine, but these things happen very, very rarely, less than 1% of the time. And similarly, for Bietta being prescribed as what's called a first-line monotherapy, sort of the first medicine, that happens 1% or less than 1% of the time. Again, because of this, this is not something that Lilly has created. This is just a fact of the marketplace that patients would much prefer to take a pill if they can. So unless Your Honors have additional questions, I would simply conclude by saying this is an appeal from the denial of a preliminary injunction. A preliminary injunction is an extraordinary remedy that can be awarded only on a clear showing that the party is entitled to relief, as the Supreme Court said in Winter, and we think in this case that it's clear that the district court did not abuse its discretion. Is this a typical joint working agreement in the pharmaceutical industry? I mean, Lilly has a number of these collaboration agreements. I mean, that's something that Lilly… It seems to me these collaboration agreements have a built-in conflict of interest. When Lilly is marketing his own product and marketing Bietta and maybe some other product, and then there probably comes some conflict as far as the promotion. Well, you might look at it that way, Your Honor, but I mean Lilly's philosophy, and this has been borne out in the real world, is that this portfolio approach of offering a range of medications, especially when they don't compete, and, you know, Lilly's view is there really is no significant competition between these two, is beneficial for all of the medicines. And, you know, even just to take a simple example, even where you have absolutely direct competition, just use a homely example of, you know, for different kinds of coffee at the grocery store, and they're lined up on the shelf, one next to the other. You know, you could say the grocery store ought to just promote one brand of coffee, but it's very convenient to have options, and it works out quite well in practice. But here it's not directly competing. I mean, one is an oral, one is an injectable, and so, you know, we don't really think we get to the issue of a conflict of interest. The appellant seems to be arguing that the TRO was issued, but then the preliminary injunction was that the TRO was vacated, and the preliminary injunction was denied, that somehow because the district court didn't revisit certain things said in the TRO that were supposed to give them some deference. I don't know exactly how. I think I heard them say that, and I think that's completely incorrect. I mean, the district court vacated the TRO in its entirety. The basis for the TRO was that Amelin had said that its confidential information was going to be disclosed to BI, and the district court, ruling quickly as they have to in a TRO situation, said, well, that seems to be a matter of concern. I'm going to put a TRO into place. And then, I mean, it not only became clear that there was not a likelihood of disclosure, but Amelin actually conceded at the preliminary injunction hearing, and this is noted in a footnote in the preliminary injunction order, that, well, we really don't have evidence of disclosure or likely disclosure, and we're actually now claiming there's going to be misuse, that the sales representatives who are expressly authorized to have this information, it's right in the agreement, are going to misuse it in some way. Well, I think they also argue then that the district court somehow said that misuse could never be a basis for an injunction. I didn't read the district court's decision that way. They do argue that, Your Honor, and I think that is clearly incorrect. The district court actually quoted from the Faveli decision of the Second Circuit, which says where confidential information is merely misused rather than being disclosed, damages will often be a complete remedy. And, I mean, by quoting that language, it couldn't be clearer. The court said, well, often, not always, but often, damages will be a remedy. And then the court looked at the facts of this case and said, I think damages will be sufficient here. So I think that's, that argument is a nonstarter. Now, the evidence at the hearing, there was, your expert said that damages could be calculated? That's correct. And theirs said? Theirs said nothing. That's a very important point. Again, we go back to it's their burden. They're the applicant for a preliminary injunction. Their expert said nothing at all. So, I mean, I think the simplest way to understand that issue was it was their burden of proof, and they didn't carry it. The Braintree Labs case from the First Circuit is a good case on that. They said, you know, there was an expert testimony, and so there's a failure of proof or a failure to carry a burden of evidence. And this Court's Oakland Tribune case is quite good on that, too, where at a minimum, and this is what Oakland Tribune said, the district court could say, well, conclusory sort of one-sentence assertions by interested parties, the executives of Amelin, can be given lesser weight or very little weight by the district court. That's well within the district court's discretion. All right. Thank you. Your time has expired unless there's further questions by the panel. I just have one question, Madam Education. If we reversed the lower court and had the injunction reinstated, what would your client's position be as to the amount of undertaking? Your Honor, I apologize. I was ruffling my papers, and I didn't realize you were addressing. Could I possibly ask you to repeat the question? Sure. If we reversed the lower court and had the injunction reinstated, what would the amount of undertaking your client would urge the court to require, the bound amount? Well, we have ‑‑ there's a bot declaration, and we had asked for a minimum amount of $500 million, and the harm is specified in that affidavit. Your Honor, I have a few points on rebuttal. First, as to the portfolio approach, that doesn't appear anywhere in the agreements. In fact, the options that we have in the agreement,    with respect to competing products, sets a very high standard for Lilly to promote our product as if it were its own product. And if Lilly is to promote another product, it must do so as if it has no interest in that other product. So while we've heard a lot of reference to a portfolio approach, in fact, that's Lilly's business model, but it's not our contractual agreement. With respect to Actos, Your Honor, that is an historical fact that at the very beginning, before we even launched Bayada, Lilly had been marketing Actos. But the actual overlap between Lilly marketing Actos in the United States and our drug is barely a year, as shown by the APLE's chart. And it was understood at the beginning, according to the declaration of Mr. Bradbury, that Actos would be phased out. Actos is a completely different situation than the one here, where you actually have direct competition and fierce competition between Exenatide and the DPP-4s. And I believe I heard opposing counsel suggest that there was no competition between Bayada and DPP-4s. That is directly and abundantly refuted by the record, including by the American Association of Clinical Endocrinologists, who make it very clear that these two are in direct competition and that RGLP-1 is the recommended treatment for patients in dual and triple therapies. And certainly the record teems with evidence showing that the alliance recognized that direct competition and for years has worked for it. And now to prove the very real risk to Amlin and to Bidurian, opposing counsel has just confirmed that Lilly will take on the strategy. Can you claim a risk to Bidurian if it's not even approved at this point? Absolutely, Your Honor. That was before the court blow. It was referenced in several ways. But why wouldn't that be speculative if we don't even know if it's going to be approved? Well, because the alliance has made the significant investment. It has already been launched in Europe. It is expecting FDA approval. It requires a lot of lead time, Your Honor, to get this drug to market. And certainly even with Trojanta, they worked months ahead. In our record, the promotional plan agreement dated September 2010 actually envisages the launch of Bidurian, and they were planning as early as September 2010. The Vince Mihalik declaration references that the new sales plan that Lilly has will include Bidurian with a single sales force. And that creates the very real risk of jeopardizing the launch of Bidurian. Now, don't take my word for it, Your Honor, about the irreparability of the harm to a launch. I would just ask that you take Lilly's own words at page 19 of the brief in which Lilly makes clear that a botched launch can have permanent and irreparable consequences that cannot be quantified. And just to quote Lilly on that, because it says, quote, at page 19, the sales pattern established during this initial period is likely to persist throughout the lifespan of the medication because, and it's speaking about its own drug, Trojanta, lacks an established sales record, the damages resulting from an injunction would be difficult or impossible to calculate. That is the exact situation in which Bidurian finds itself with no established track record. The conclusory affidavit of Lilly's expert, Mr. Redenke, just says in almost a throwaway line that these general economic theories can be used to calculate damages even for Bidurian. So what evidence did your expert have put in the record of that damages would not be adequate? The record abounds with evidence that this is a new drug with no track record. I ask, what did your expert say? It's not a question of we had lay testimony and sworn affidavits. Okay. But directly answer my question. What did your expert say? The expert explained that this was a – the expert didn't respond to the conclusory throwaway line of Lilly's expert, mainly because actually the district court itself didn't give it any credence because it was submitted only before the TRO, in which the district court, as Your Honor knows, found irreparable harm. There was no reason to go and supplement that record on that point. The district court had already gone by that. All right. You need to wrap up. You're in overtime at this point. Yes. Thank you very much, Your Honor. As to the misuse of confidential information, the issue here, Your Honor, is that the adversary, the opposing team, has the playbook updated daily, and it will have the playbook as we're about to launch by durian. Their expert made no effort to quantify that damage. And Lilly's – Lilly's witnesses all testified that that would cause irreparable and unquantifiable harm. The mere fact that there are supposedly strict procedures, that's not going to preclude it. You know, in Pepsi, they rejected that type of, you know, undertaking. The real issue is here, Lilly may say it doesn't have an incentive, but its representatives have a financial incentive, a direct one. Their paycheck depends on maximizing sales of the competing drug. It is established they will now have our confidential information, which is designed to capture a market share away from that competing drug. It is just impossible to believe that they won't use it. And that's been abundantly established in the record. It's not a question, Your Honor. You know, counsel, wrap-up doesn't mean go on and on and on on new issues. It is wrap-up. All right. I think unless there's further questions, we – I think we have your argument well in mind. Do any of the judges have further questions? No. All right. Then this matter will stand submitted. Thank you.
judges: Timlin, Fernandez, Callahan